Gregory J. Glaser (SBN 226706)
4399 Buckboard Drive, Box 423
Copperopolis, CA 95228
Ph. (925) 642-6651
Fx. (209) 729-4557
greg@gregglaser.com

Ray L. Flores II (SBN 233643)
11622 El Camino Real Suite 100
San Diego, CA 92130
Ph. (858) 367-0397
Fx. (888) 336-4037
rayfloreslaw@gmail.com

Attorneys for Petitioners

## UNITED STATES DISTRICT COURT OF CALIFORNIA

## EASTERN DISTRICT - SACRAMENTO

| | |
|---|---|
| Joy Garner, individually and on behalf of The Control Group; Joy Elisse Garner, individually and as parent of J.S. and F.G.; Evan Glasco, individually and as parent of F.G.; Traci Music, individually and as parent of K.M. and J.S., Michael Harris, individually and as parent of S.H., Nicole Harris, individually and as parent of S.H., <br><br> Petitioners, <br><br> v. <br><br> DONALD JOHN TRUMP, in his official capacity as PRESIDENT OF THE UNITED STATES OF AMERICA, <br><br> Respondent. | Case No.: 2:20−CV−02470−WBS−JDP <br><br> PETITIONERS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION, OR IN THE ALTERNATIVE REQUEST FOR ORDER TO SHOW CAUSE <br><br> Date:        February 22, 2021 <br> Time:       1:30 PM <br> Courtroom:  5 <br> Judge:      William B. Shubb |

# **TABLE OF CONTENTS**

Page #

TABLE OF AUTHORITIES ...........................................................................................ii

PETITIONERS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR PRELIMINARYI INJUNCTION, OR IN THE ALTERNATIVE REQUEST
FOR ORDER TO SHOW CAUSE ..................................................................................1

I.    INTRODUCTION .........................................................................................1

II.   FACTUAL BACKGROUND ..........................................................................2

III.  ARGUMENT ................................................................................................4

    A.   Petitioners Have Established Article III Standing. ...................................4

    B.   Petitioners Satisfy All Four Elements For Preliminary Injunctive
        Relief. .............................................................................................5

        1.   Petitioners Are Likely to Succeed on the Merits. .............................5

            a.   Petitioners' Judicial Notice Evidence Is Indisputable. ............5

            b.   Now That the Evidence Is Indisputable, It Is An Abuse
                of Discretion to Forego Saving Our Nation..........................7

            c.   Common Sense Also Weighs In Petitioners' Favor. ...............8

            d.   Mandamus Against An Executive Is The Proper
                Function of the Court. ...........................................................10

            e.   Recognizing the Utility of Pilot Surveys .............................11

            f.   Informed Consent / Informed Refusal ..................................14

        2.   Petitioners Are Likely To Suffer Irreparable Harm in the
            Absence of Preliminary Injunction. ...................................................14

        3.   The Balance of Equities Weighs in Petitioners' Favor.....................16

            a.   The Balance of Equities Favors Non-Discrimination...........17

            b.   Health Agency Experts Pitch Slogans and Assumptions,
                Not Numbers.  Petitioners Provide Statistically
                Confirmed Numbers; Petitioners Also Warn The Court
                In Advance Of The Slogan Tactics of Health Agencies.......18

        4.   The Requested Relief is Genuinely in the Public Interest. ...............20

    C.   Petitioners' Request in the Alternative for Order To Show Cause ...............20

IV.   CONCLUSION............................................................................................23

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*Aguayo v. Richardson,*
    473 F.2d 1090 (2d Cir. 1973)........................................................................... 7

*All. for the Wild Rockies v. Cottrell,*
    632 F.3d 1127 (9th Cir. 2011) ............................................................. 5, 17, 20

*American Hosp. Supply Corp.,*
    780 F.2d 589 (7th Cir. 1986) ......................................................................... 17

*Anderson v. City of Taylor,*
    2005 U.S. Dist. Lexis 44706 (E.D. Mich. August 11, 2005)....................... 14

*Ariz. Dream Act Coalition v. Brewer,*
    757 F.3d 1053 (9th Cir. 2014) ....................................................................... 14

*Calvary Chapel Dayton Valley v. Sisolak,*
    No. 20-16169, 2020 U.S. App. LEXIS 39266 (9th Cir. Dec. 15, 2020).......... 20

*Caribbean Marine Servs. Co., Inc. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ......................................................................... 15

*City & Cty. of S.F. v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) ......................................................................... 7

*City & Cty. of San Francisco v. U.S. Dept. of Homeland Security,*
    944 F.3d 773 (9th Cir. 2019) ....................................................................... 4, 5

*Clackamas Cty. v. McKay,*
    94 U.S. App. D.C. 108, 219 F.2d 479 (D.C. Cir. 1954) ............................... 10

*CNB Fin. Corp. v. CNB Cmty. Bank (IO),*
    No. 03-6945 (PBT), 2004 U.S. Dist. LEXIS 21483 (E.D. Pa. Sep. 29, 2004) .......... 11

*Coleman v. Schwarzenegger,*
    922 F. Supp. 2d 882 (E.D. Cal. 2009)........................................................... 21

*Cruzan v. Director, Missouri Department of Health,*
    497 U.S. 261, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990)........................... 14

*Drakes Bay Oyster Co. v. Jewell,*
    747 F.3d 1073 (9th Cir. 2014) ....................................................................... 17

*Dubbs v. Head Start, Inc.,*
    336 F.3d 1194 (10th Cir. 2003) ..................................................................... 14

*Estate of McGough v. Lockheed Martin,*
  12 F. App'x 464 (9th Cir. 2001) ..................................................................... 9

*Finjan, Inc. v. Blue Coat Sys., LLC,*
  283 F. Supp. 3d 839 (N.D. Cal. 2017) ........................................................... 9

*Frost & Frost Trucking Co. v. R.R. Com. of Cal.,*
  271 U.S. 583 (1926) ....................................................................................... 15

*Harris v. Bd. of Supervisors,*
  366 F.3d 754 (9th Cir. 2004) ........................................................................... 4

*Harvest Rock Church, Inc. v. Newsom,*
  No. 20A94, 592 U.S. ___, 2020 U.S. LEXIS 5709 (Dec. 3, 2020) ........................................... 20

*Jew Ho v. Williamson*
  103 F. 10 (Cir. Ct. N.D. Cal. 1900) .............................................................. 14

*Kendall v. United States,*
  12 Pet. 524, 37 U.S. 524, 9 L.Ed. 1181 (1838) ............................................. 10

*L.A. Mem'l Coliseum Comm'n v. Nat'l Football League,*
  634 F.2d 1197 (9th Cir. 1980) ......................................................................... 16

*Levi Strauss & Co. v. Blue Bell, Inc.,*
  778 F.2d 1352 (9th Cir. 1985) ......................................................................... 11

*Lorillard Tobacco Co. v. Reilly.*
  533 U.S. 525 (2001) ......................................................................................... 12

*Marbury v. Madison,*
  1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803) ............................................... 10

*Masses Pub. Co. v. Patten,*
  246 F. 24 (2d Cir. 1917) .................................................................................... 8

*McDonnell Douglas Corp. v. Green,*
  411 U.S. 792 (1973) ......................................................................................... 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ........................................................................................... 9

*Nat'l Treasury Emps. Union v. Nixon,*
  160 U.S. App. D.C. 321, 492 F.2d 587 (D.C. Cir. 1974) ............................. 10

*Nelson v. NASA,*
  530 F.3d 865 (9th Cir. 2008) ........................................................................... 14

*Nixon v. Sirica,*
  487 F.2d 700 (D.C. Cir. 1973) ......................................................................... 10

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................. 17

*O'Farrell v. Funk*,
   No. 05-1074, 2006 U.S. Dist. LEXIS 72060 (C.D. Ill. Sep. 21, 2006) ........................ 9

*Opticians Ass'n of America v. Independent Opticians of America*,
   920 F.2d 187 (3d Cir. 1990) ...................................................................... 11

*Pac. Legal Found. v. Watt*,
   529 F. Supp. 982 (D. Mont. 1981) ............................................................... 8

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*,
   944 F.2d 597 (9th Cir. 1991) .................................................................... 14

*Roman Catholic Diocese v. Cuomo*,
   592 U.S. ___, 141 S. Ct. 63, 208 L. Ed. 2d 206 (Nov. 25, 2020) ................... 13, 14, 20

*Rosebud Sioux Tribe v. Trump*,
   2020 U.S. Dist. LEXIS 192328, 2020 WL 6119319 (D. Mont. Oct. 16, 2020) ................ 17

*S. Bay United Pentecostal Church v. Newsom*,
   981 F.3d 765-66 (9th Cir. Dec. 8, 2020) ........................................................ 20

*Schering Corp. v. Pfizer Inc.*,
   189 F.3d 218 (2d Cir. 1999) ..................................................................... 11

*Seaton v. Tex. Co.*,
   103 U.S. App. D.C. 163, 256 F.2d 718 (1958) ................................................... 10

*Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' International Assoc.*,
   611 F.3d 483 (9th Cir. 2010) ...................................................................... 5

*Spokeo, Inc. v. Robins*,
   136 S.Ct. 1540 (2016) ............................................................................. 4

*Troxel v. Granville*,
   530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) ......................................... 14

*United States v. Hand*,
   No. CV 15-96-H-CCL, 2017 U.S. Dist. LEXIS 6657 (D. Mont. Jan. 18, 2017) ................. 22

*Williams v. Edwards*,
   87 F.3d 126 (5th Cir. 1996) ....................................................................... 8

*Winter v. NRDC*,
   555 U.S. 7 (2008) .............................................................................. 5, 16

*Zippo Mfg. Co. v. Rogers Imps., Inc.*,
   216 F. Supp. 670 (S.D.N.Y. 1963) ............................................................... 11

PETITIONERS' MPA ISO PRELIMINARY INJUNCTION

**California Cases**

*Mark's Engine Company No. 28 Restaurant LLC v. County of Los Angeles, et al.*,
  Case Number 20STCV45134 (Superior Court of California, County of Los
  Angeles) (Minute Order December 8, 2020) ........................................................... 21

*Midway Venture LLC v. County of San Diego*,
  Case Number 37-2020-00038194-CU-CR-CTL (Superior Court of California,
  County of San Diego) (Minute Order dated December 16, 2020) ............................. 21

**Other State Cases**

*End Lead Poisoning v. Koch*,
  138 Misc.2d 188, 524 N.Y.S.2d 314 (1987) .............................................................. 7

**United States Constitution**

  Article I ...................................................................................................................... 9
  Article II, § 3 ............................................................................................................. 7
  Article III ........................................................................................................... 4, 15
  First Amendment ...................................................................................................... 12
  Fourth Amendment ................................................................................................... 14

**Federal Rules of Evidence**

  Rule 201 ..................................................................................................................... 6
  Rule 301 ..................................................................................................................... 6

**Other Authorities**

55 C.J.S. Mandamus
  § 65 (2019) ................................................................................................................. 5

Ealy H., et al., *Covid-19 Data Collection, Comorbidity & Federal Law: A Historical
  Retrospective.* SCIENCE, PUBLIC HEALTH POLICY & THE LAW, Vol. 2: 4-12 (Oct.
  12, 2020), https://www.publichealthpolicyjournal.com/ethics-in-science-and-
  technololgy ............................................................................................................... 18

Lewis, C.S., *God In The Dock* (1948) ........................................................................... 16

Rachael N. Pine, *Speculation and Reality: The Role of Facts in Judicial Protection of
  Fundamental Rights*, 136 U. PA. L. REV. 655, 726–27 (1988) ................................ 13

Wendy E. Parmet, *Public Health and Constitutional Law: Recognizing the
  Relationship*, 10 J. HEALTH CARE L. & POL'Y 13 (2007), available at:
  http://digitalcommons.law.umaryland.edu/jhclp/vol10/iss1/3 ................................. 12

## I.  INTRODUCTION

Where exactly is your immune system located?  It is **everywhere** within your whole body, which is why vaccination alters your whole body. Every single page in Petitioners' Requests for Judicial Notice comes from an authoritative source (i.e., CDC, top medical journals, medical encyclopedias) utilized by public health officials. It is indisputable that there exists today a national pandemic of immune-related chronic diseases, disabilities, and disorders in the United States of America ("National Health Pandemic").

For the first time ever, Petitioners' initial pilot survey evidences that Americans who avoid vaccines are exponentially healthier than the 99%+ of the American population that has received vaccines. Vaccines are causing the **immune system** health crisis because vaccines are literally designed to cause, and do cause, permanent alterations to the **immune system**. For the first time ever, Petitioners' Control Group pilot survey confirms such causation (with precise numerical accuracy, via 99% Confidence Interval [5.95-5.99], exponential p-values, and more).



With experimental vaccines (namely, Covid-19) being released at warp speed into CDC child & adult vaccine schedules (already requiring 100+ lifetime vaccine doses per person), enough is enough. The public has a right to decline forced vaccination while both the Court and Respondent weigh in on the extensive evidence presented in this case.

As a matter of national security, confirming this new pilot survey evidence determines the scientific cause of this National Health Pandemic. And this requires immediate judicial intervention to preserve the status quo while protecting 'control groups' necessary to the scientific method.

A preliminary injunction is therefore necessary to preserve such evidence, namely, to preserve the 'due process' guaranteed physical bodies of scientific control groups. The scientific method requires true controls in product safety inquiry. In order for the surveying of unvaccinated individuals to be conducted scientifically and without fear of retribution, an unvaccinated control group must remain intact and remain free from discrimination and coercion with respect to their military service, education, livelihood, and religious freedom.

The Verified Petition filed in this case confirms Petitioners suffer daily vilification and threats of mandatory vaccination. America has been segregated by vaccination status, such as public schools for the vaccinated, but homeschools for the unvaccinated; employment opportunity for the vaccinated, but self-employment for the unvaccinated. Separate is not equal. As such, the purpose of this Motion for Preliminary Injunction is to protect Petitioners from further discrimination and threats, and to request the Court protect individuals as potential candidates for scientific control group surveys and studies. This end can be achieved by the Court simply issuing a preservation of evidence order that upholds the right and ethic of informed consent/refusal, by prohibiting discrimination on the basis of vaccination status.

## II.  FACTUAL BACKGROUND

By virtue of judicial notice, Petitioners' indisputable evidence proves four primary facts that define this case:

1. **National Health Pandemic**. The United States of America is suffering a pandemic of chronic diseases, disabilities, and disorders that are the result of injured and

1    dysfunctional immune systems. *See* Petitioners' Request for Judicial Notice, Appendix

2    One ("PRJN1").

3    2.  **Immunity Altered.** Vaccines are designed to cause, and do cause, permanent alterations

4        to the immune system. *See* PRJN1 and Petitioners' Request for Judicial Notice,

5        Appendix Two ("PRJN2").

6    3.  **Numerically Undefined.** The United States government has never publicly evaluated

7        vaccines numerically for long-term or cumulative health risks, in comparison to a large

8        group of fully unvaccinated individuals. *See* PRJN2.

9    4.  **Unvaccinated Population Endangered.** More than 99% of the American population

10       has received one or more vaccinations. Less than 1% of Americans remain entirely

11       unexposed. *See* PRJN2.

12   These four large facts define Petitioners' case, and within each large fact are hundreds of

13   other nuanced supporting facts.  For example, supporting Fact #1, Petitioners' Requests for Judicial

14   Notice prove unprecedented rates of disabling brain and nervous system injuries and disorders,

15   major organ failures, intellectual and behavioral disabilities, arthritis, diabetes, life-threatening

16   allergies, and autoimmune, and other chronic conditions are all sharply rising. *See* PRJN1. Cancer

17   rates are skyrocketing, with cancer now being the most common cause of death by disease in

18   American *children*. *See* especially, PRJN1, Sec. 20. These crippling losses are exacerbated by

19   already-insufficient, and rapidly-declining, intellectually and physically-viable human resources

20   available to sustain our National Security. *See* PRJN1-2.

21   Petitioners' Requests for Judicial Notice also prove that without expedient scientific

22   confirmation of the primary cause of this catastrophe, immediately followed by a swift reversal of

23   our current trajectory, our national economy will ultimately collapse under the weight of

24   disabilities, loss of workforce, explosive healthcare costs, plummeting fertility, and a profound loss

25   of intellectual capacity within our remaining population. *See* PRJN1-2.

26   Petitioners' Pilot Survey evidence is the first of its kind. For the entire duration of American

27   history and to the present day, no scientist or any institution has ever before published conclusive

28   mathematical data proving the long-term cumulative health effects of vaccines recommend by the

3

United States government. Consequently, it has been mathematically impossible for any public health official in America to specify reliable risk/benefit ratios in deciding whether or not this class of pharmaceutical product is, in the aggregate, helping or damaging public health. In other words, how can vaccine mandates be narrowly tailored to achieve a compelling government interest if the public health officials cannot even prove whether their mandated cure is worse than the disease?

All of this is proven in meticulous detail in PRJN1-2, and supported further by Petitioners' expert declarations: Tina Kimmel, PhD ("Dr. Kimmel Decl."), Vicky Pebsworth, PhD ("Dr. Pebsworth Decl."), Douglas Hulstedt, MD ("Dr. Hulstedt Decl."), LeTrinh Hoang, DO ("Dr. Hoang Decl."), and Rachel West, DO ("Dr. West Decl.").  Petitioners are willing and able to obtain supporting declarations from 100+ more physicians if requested by the Court, but suffice to say, the above referenced declarations are genuinely representative of the well-respected field of integrative medicine (the leading branch of medicine recognizing underreporting of vaccine injuries).

Simply put, without a control group of unvaccinated Americans, the scientific method cannot be employed.  Our Nation will collapse without protections for the unvaccinated, whose very bodies hold the evidence to heal the Country.  The Judiciary is the branch of government tasked with preservation of evidence.

**III. ARGUMENT**

**A.  Petitioners Have Established Article III Standing.**

To demonstrate Article III standing, a plaintiff must show a "concrete and particularized" injury that is "fairly traceable" to the defendant's conduct and "that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547-48 (2016); *City & Cty. of San Francisco v. U.S. Dept. of Homeland Security*, 944 F.3d 773, 786-87 (9th Cir. 2019).

Here, Petitioners' Verified Petition devotes multiple paragraphs to describing in detail the ways that their injuries are concrete and particularized. *See* especially section VI of the Verified Petition entitled "Concrete and Particularized Injuries In Fact" and section IV entitled "Parties". Petitioners will clearly be redressed by a favorable decision and therefore have standing to sue. Petitioners "need only establish a risk or threat of injury to satisfy the actual injury requirement." *City & Cty. of San Francisco*, 944 F.3d at 787 (quoting *Harris v. Bd. of Supervisors*, 366 F.3d 754,

4

762 (9th Cir. 2004) (emphasis in original)).

**B.  Petitioners Satisfy All Four Elements For Preliminary Injunctive Relief.**

"Generally, the purpose of a preliminary injunction is to preserve the status quo and the rights of the parties until a final judgment issues in the cause." *City & Cty. of San Francisco*, 944 F.3d at 789.  Petitioners can obtain a preliminary injunction where they establish four factors: "(1) that [they are] likely to succeed on the merits, (2) that [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in [their] favor, and (4) that an injunction is in the public interest." *Id.* at 788-89 (quoting *Winter v. NRDC*, 555 U.S. 7, 22 (2008)). In the alternative, however, "'serious questions going to the merits' and a balance of hardship that tips sharply towards the plaintiff[s] can support issuance of a preliminary injunction, so long as the plaintiff[s] also show[] that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 789 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). *Small ex rel. NLRB v. Operative Plasterers' & Cement Masons' International Assoc.*, 611 F.3d 483, 489-90 (9th Cir. 2010).

**1.  Petitioners Are Likely to Succeed on the Merits.**

**a.  Petitioners' Judicial Notice Evidence Is Indisputable.**

As a threshold matter, the moving party must establish a likelihood of success on the merits of his claims before a court can grant a preliminary injunction. *Winter*, *supra,* 555 U.S. at 20. In the Ninth Circuit, this threshold showing can be met by demonstrating that there are serious questions going to the merits of the claims.[1]

The overwhelming evidence contained in the accompanying Requests for Judicial Notice are the most comprehensive and authoritative on the subject of the crippling effects of vaccines; a storm that will wash out the paper-maché edifice of, heretofore, the State's "safe and effective" claims from this point forward, forever. Determining the scientific causes of the National Health Pandemic

---

[1]   "The writ [of mandamus] will not issue where a question of fact must be determined before the right to the writ can be established. In other words, the facts of the case must be indisputable. However, objections to mandamus that are based on mere technical questions will be disregarded if the right is clear and the case meritorious." [Citations omitted.] 55 C.J.S. Mandamus § 65 (2019), *Clear Legal Right*.

1  clearly require that the President take immediate action to protect and survey control groups
2  necessary to the scientific method as a matter of National Security.

3        As one example, completely absent from 'vaccine safety' science are double-blind, placebo-
4  controlled studies.  *See* PRJN2, paragraphs 7-8 ("Placebo" and "Use of So-Called Placebos in
5  Vaccine Safety Testing Are Designed to Harm Humans").  This fact alone should leave the
6  Respondent struggling to find any coherent, truly scientific evidence of vaccine safety.  Respondent
7  will not be able to counter Petitioners' undisputed evidence that vaccines are the root cause of the
8  National Health Pandemic.  The weight of Petitioners' judicially noticeable evidence is nothing
9  short of extraordinary.  And Respondent can produce no study comparing the health of vaccinated
10  versus unvaccinated to rule out vaccines as the culprit in the National Health Crisis.

11        Further, in light of the evidence now before him, Respondent will not be able to justify the
12  failure to take action, in the form of the relief requested, in his approximately four years of office.
13  Allowing these violations of the Constitution to have continued for so long would be
14  unconscionable, were the scientific evidence now before him previously known and weighed.  Even
15  the act of judicial notice itself provides such weight as to require relief.

16        Moreover, because Petitioners have supplied (through judicially noticeable evidence) proof
17  that the government has **never** provided overall numerical risk values associated with vaccination,
18  this judicial notice fact should automatically invoke rule 301 of the Federal Rules of Evidence:

19        In a civil case, unless a federal statute or these rules provide otherwise, the party
20        against whom a presumption is directed has the burden of producing evidence to
        rebut the presumption. But this rule does not shift the burden of persuasion, which
21        remains on the party who had it originally.

22        Petitioners have supplied reliable numerical evidence as to what the risks actually appear to
23  be at this time. There certainly can be no presumption that 'vaccines are good for public health', due
24  to the fact the risks of vaccination remained without enumeration until this survey was done.
25  Petitioners therefore request this Court require the Respondent to produce actual numbers (risk
26  values) to rebut the presumption that vaccines are unavoidably unsafe.  Frankly, pursuant to Federal
27  Rules of Evidence, rule 201 (Relevance), the only relevant rebuttal evidence Respondent should be
28  allowed to offer is an actual body count (the actual number of vaccine injury victims); anything else

1  is at best a distraction and at worst an obfuscation tactic.

2  **b. Now That the Evidence Is Indisputable, It Is An Abuse of Discretion to Forego Saving Our Nation.**

4  The Verified Petition makes it clear that the President is required to take some identifiable

5  action to save the Nation. Currently, the President has not even recognized the existence of this

6  chronic illness threat of impending destruction to our Nation, let alone taken some action in his

7  discretion to address the threat.[2]  This constitutes an abuse of discretion, a well-recognized example

8  authorizing mandamus. A very good example is *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir.

9  1973) (granting mandamus to welfare parents and children, such that the sanction of an otherwise

10  mandatory health and safety program was temporarily stayed).  Note in particular how the *Aguayo*

11  court recognized the presumptive utility of the health & safety program, and yet still granted

12  mandamus to the families (effectively opting them out of the public health & safety program) on the

13  grounds that the balance of hardships weighed in their favor as a minority group.  Coincidentally,

14  the appellate court even mentioned the utility of 'controlled experiment' science, implicitly

15  criticizing one-size-fits-all health and safety policy.

16  Note also that courts have overruled motions to dismiss on the grounds that although a

17  method of enforcement may be discretionary, enforcement itself is subject to mandamus.[3]  Clear

---

18  [2]  "[T]he President has a corresponding obligation-to 'take Care that the Laws be faithfully
19  executed.' U.S. Const. art. II, § 3. Because Congress's legislative power is inextricable from its
spending power, the President's duty to enforce the laws necessarily extends to appropriations.
20  Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of
the President's constitutional role." *City & Cty. of S.F. v. Trump*, 897 F.3d 1225, 1234 (9th Cir.
21  2018).

22  [3]  *End Lead Poisoning v. Koch*, 138 Misc.2d 188, 524 N.Y.S.2d 314 (1987) (overruling
motion to dismiss on the grounds that the lead-based paint problem persists so the government must
23  take some action to abate lead-based paint; "Although the method of enforcement may be
discretionary, enforcement is not.") Here, Petitioners are the proverbial students in the hallway who
24  observe copious amounts of fire and smoke, and therefore they break the glass (that must only be
broken during an emergency) and they pull the red alarm handle.  In this case, the red handle is
25  mandamus. There is ample precedent showing it is necessary and appropriate during a fire to break
the glass and pull the handle. For example, the government routinely declares emergencies, on
26  everything from natural disasters to opioid addiction. And the government already surveys annually
the health of all Americans. Indeed, if the government failed to complete the annual health survey
27  authorized by Congress, then mandamus would be an instantly appropriate remedy. Likewise,
pursuant to the Constitution for the United States of America, the President must take some action
28  in his discretion to protect our Nation from imminent collapse.  Petitioners submit that a nationwide
health survey is the most logical solution.  But regardless, the President must take some action in his

7

1    cases of emergency are particularly ripe for mandamus. *See, e.g.*, *Williams v. Edwards*, 87 F.3d 126,

2    128 (5th Cir. 1996) ("By 1989, conditions in Louisiana prisons had so deteriorated that the district

3    court declared a "state of emergency" and appointed an expert to assist in resolving these

4    problems."); *Pac. Legal Found. v. Watt*, 529 F. Supp. 982 (D. Mont. 1981) (federal district court in

5    Montana upheld a statute empowering a House committee to declare an "emergency situation" with

6    regard to public lands and to direct the Secretary of the Interior to withdraw the lands from mineral

7    leasing activities. The court construed the statute narrowly as leaving to the Secretary the decision

8    on the scope and duration of the withdrawal, however, so as to avoid problems under the separation

9    of powers doctrine).

10                              **c.   Common Sense Also Weighs In Petitioners' Favor.**

11                Courts recognize common sense in granting mandamus.  *See, e.g.*, *Masses Pub. Co. v.*

12   *Patten*, 246 F. 24, 33 (2d Cir. 1917) ("This court holds, therefore, that if the Postmaster General has

13   been authorized and directed by Congress not to transmit certain matter by mail, and is to determine

14   whether a particular publication is nonmailable under the law, he is required to use judgment and

15   discretion in so determining, and his decision must be regarded as conclusive by the courts, <u>unless it</u>

16   <u>appears that it is clearly wrong</u>.") (emphasis added).

17                A great deal of Petitioners' evidence, attached to the supporting declarations, is devoted to

18   common sense.  For the sake of our country, Petitioners plead with the Court to read the supporting

19   declarations through and through, especially the exhibits attached to the declaration of Joy Garner

20   ("Garner Decl.") who conducted the Pilot Survey and prepared detailed reports explaining the

21   implications for our National Security.  For if ever there was an 'expert' in common sense, it is Joy

22   Garner. Hell hath no fury like this patriotic woman scorned.

23                Petitioners' Requests for Judicial Notice establish conclusively that vaccines meet the

24   dictionary definition of "experimental", because the government admits it has literally zero numbers

25   to justify the vaccine program, specifically the government admits it has never studied or considered

26

27   discretion to protect the Nation.  While the choice and manner of action remains in the President's
     discretion, the requirement for action is not. The requirement for action is the purpose of
28   mandamus.

1  vaccinated versus unvaccinated numbers. *See, e.g.*, PRJN2, section 15. This means there is no

2  amount of FDA blessings or opinions that can be sufficient to force any court to ignore Webster's

3  Dictionary.

4       Numbers and data are evidence, but the government's numerically devoid opinions are not

5  evidence. *Finjan, Inc. v. Blue Coat Sys., LLC*, 283 F. Supp. 3d 839, 864 (N.D. Cal. 2017) ("Expert

6  opinions are not evidence; thus, an expert's unsupported assertion that an accused product contains a

7  claim element is not sufficient to raise a material dispute.")[4]

8       Moreover, FDA approval of an ongoing human medical experiment without informed

9  consent does not deprive individuals of their absolute Constitutional right to refuse to participate.

10  Nowhere in the Constitution is any branch of government granted the power to use biological

11  alternation drugs to experiment upon Americans without their consent.  *See, e.g.*, *Nat'l Fed'n of*

12  *Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (finding Congress exceeded its enumerated powers

13  with Obamacare and violated principles of federalism by the specific way it mandated health

14  insurance upon otherwise free Americans):

15         The dissent's exposition of the wonderful things the Federal Government has
16         achieved through exercise of its assigned powers… is quite beside the point….The
       issue here is whether the Federal Government can impose the Individual Mandate
17         through the <u>Commerce Clause</u>….The dissent treats the Constitution as though it is an
       enumeration of those problems that the Federal Government can address--among
18         which, it finds, is "the Nation's course in the economic and social welfare realm,"
       *ibid.*, and more specifically "the problem of the uninsured," *ante*, at 595, 183 L. Ed.
19         2d, at 503. The Constitution is not that. It enumerates not federally soluble *problems*,
       but federally available *powers.* The Federal Government can address whatever
20         problems it wants but can bring to their solution only those powers that the
       Constitution confers, among which is the power to regulate commerce. None of our
21         cases say anything else. Article I contains no whatever-it-takes-to-solve-a-national-
       problem power.

22  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. at 659-60.

23

24  --------

[4]    *See also O'Farrell v. Funk*, No. 05-1074, 2006 U.S. Dist. LEXIS 72060, at \*56 (C.D. Ill.
25  Sep. 21, 2006) ("O'Farrell accuses Dr. Funk of vindictively refusing to order the treatment which
other providers recommended. He characterizes Dr. Funk as an incompetent physician who mean-
26  spiritedly refused to follow the recommendations of other doctors out of spite. However, O'Farrell's
opinions are not evidence and cannot defeat an otherwise appropriate motion for summary
27  judgment."); *Estate of McGough v. Lockheed Martin*, 12 F. App'x 464, 471 (9th Cir. 2001) (nuclear
engineer's "opinions . . . are not evidence that raises a genuine issue of fact that can defeat summary
28  judgment.").

### d.  Mandamus Against An Executive Is The Proper Function of the Court.

It is well recognized that mandamus against an Executive, even the President of the United States of America, is authorized. With all due respect to President Trump, mandamus is necessary in this case. A judicial duty exists whether the President or a subordinate executive officer is the defendant.

> "The discretionary-ministerial distinction concerns the nature of the act or omission under review not the official title of the defendant. No case holds that an act is discretionary merely because the President is the actor." *Nixon v. Sirica*, *supra* (487 F.2d [700] at 712) [(D.C. Cir. 1973)] (footnote omitted).

*Nat'l Treasury Emps. Union v. Nixon*, 160 U.S. App. D.C. 321, 492 F.2d 587 (D.C. Cir. 1974) (upholding mandamus against the President to require a pay raise). *See also Clackamas Cty. v. McKay*, 94 U.S. App. D.C. 108, 219 F.2d 479 (D.C. Cir. 1954) (a writ of mandamus directed to defendant Secretary of the Interior and an injunction directed to defendant Secretary of Agriculture, to claim proceeds from the sale of timber taken from public land):

> Within the last twenty years the highest courts of thirty-two states have sustained the issuance of mandamus to compel ministerial action by administrative officials in government….

A long list of cases is cited in *Clackamas* upholding mandamus against an executive official, which illustrates the proper function of the judiciary in providing a check and balance on the executive's interpretation and hence, enforcement of law. This nuance is well illustrated by the court in *Seaton v. Tex. Co.*, 103 U.S. App. D.C. 163, 256 F.2d 718, 723 (1958):

> Some opinions state that the courts have authority to intervene when the duty of the executive officer is ministerial, in which event mandamus will lie. *United States ex rel. Barton v. Wilbur, supra*; *Decatur v. Paulding, supra*; *Kendall v. United States*, 12 Pet. 524, 37 U.S. 524, 9 L.Ed. 1181 [(1838)]; *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 [(1803)]. But the word 'ministerial' is not sufficiently expressive to denote adequately every situation into which the courts may enter. Indeed, a duty often becomes ministerial only after a court has reached its own judgment about a disputable legal question and its application to a factual situation.

Petitioners are not asking that any one incident or injury be compensated, or that anyone be held liable for the damage already incurred. Petitioners are merely requesting relief from further injury which is more than merely threatened. It is imminent, the numerical risks for which

1    Petitioners have taken the time to "reasonably calculate" and have expressed in the comparison

2    graphs. *See* Petitioners' Request for Demonstrative Evidence.

3                   **e.   Recognizing the Utility of Pilot Surveys.**

4          Petitioners' Request for Judicial Notice, by themselves, are sufficient to justify the relief

5    requested in this action.  But Petitioners go further with their pilot survey, proving beyond a doubt

6    the relief requested in necessary to save this Nation.  Pilot surveys are routinely admitted into

7    evidence and recognized by trial courts for proof of matters to a claim.[5],[6] Courts look for indicia of

8    trustworthiness (memory, perception, narration, sincerity). Here, Petitioners' expert declarations

9    support every indicia.  But even if a survey appears to be lacking in one category (i.e., danger of

10   faulty narration), the survey is still admissible in evidence, because the weakness goes to the weight

11   of the evidence rather than its admissibility.[7] Not only do surveys have a long history of

12   admissibility in court, but also in setting public policy. For example, with cigarettes, Surgeon

13

14

15   [5]      *See, e.g., CNB Fin. Corp. v. CNB Cmty. Bank (IO)*, No. 03-6945 (PBT), 2004 U.S. Dist.
     LEXIS 21483, at *35-36 (E.D. Pa. Sep. 30, 2004) ("In the pilot survey conducted by Bruno and
16   Ridgway Research Associates ('Bruno Report'), forty-one respondents were questioned and 13
     exhibited actual confusion in identifying a CNB sign with the correct bank. (Tr. 1. at 156). Other
17   evidence of actual confusion came to CNB's attention prior to and after CNB (IO)'s grand opening.
     (*See* Pl. Exs. 33, 36-46). Evidence of actual confusion is not required to prevail on a trademark
18   infringement claim, *Opticians* [*Ass'n of America v. Independent Opticians of America*], 920 F.2d
     [187] at 195 [(3d Cir. 1990)], however, such evidence is, of course, highly probative. This evidence,
19   along with the other evidence cited herein, supports CNB's claim as to the strength of its mark in its
     market area, particularly in light of its continuous use of the 'CNB' mark for over 40 years,
     weighing the second *Lapp* factor in CNB's favor.").

20   [6]      *Zippo Mfg. Co. v. Rogers Imps., Inc.*, 216 F. Supp. 670, 682-83 (S.D.N.Y. 1963) ("The
     weight of case authority, the consensus of legal writers, and reasoned policy considerations all
21   indicate that the hearsay rule should not bar the admission of properly conducted public surveys.
     Although courts were at first reluctant to accept survey evidence or to give it weight, the more
22   recent trend is clearly contrary.  Surveys are now admitted over the hearsay objection on two
     technically distinct bases. Some cases hold that surveys are not hearsay at all; other cases hold that
23   surveys are hearsay but are admissible because they are within the recognized exception to the
     hearsay rule for statements of present state of mind, attitude, or belief. Still other cases admit
24   surveys without stating the ground on which they are admitted. The cases holding that surveys are
     not hearsay do so on the basis that the surveys are not offered to prove the truth of what respondents
25   said and, therefore, do not fall within the classic definition of hearsay."); *see also, Schering Corp. v.
     Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999) ("There is no doubt that beginning with Judge Wilfred
26   Feinberg's seminal decision in *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670
     (S.D.N.Y. 1963), the general trend has been toward the admission of surveys of various kinds.").

27   [7]      *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352 (9th Cir. 1985) (affirming district
28   court's decision to admit surveys and determine the weight by examining methodology).

General warnings were accomplished in part through simple/traditional product health surveys of cigarette smokers (much to the chagrin of industry that tried to dismiss such evidence).

Here, Petitioners prove the TCG American Survey is a survey with the statistical power to justify the full relief requested.  The only reason Petitioners call it a "pilot" survey is because it is offered also as the prelude to the requested confirmatory national survey of an even larger number of participants. But regardless of any follow-up survey, the TCG American Survey stands presently on its own merits as a valid, legitimate, reliable survey of greater statistical weight than other surveys used by public health authorities to set public health policy in America.

In the Petition, Petitioners cite Wendy E. Parmet, *Public Health and Constitutional Law: Recognizing the Relationship*, 10 J. HEALTH CARE L. & POL'Y 13 (2007), available at: http://digitalcommons.law.umaryland.edu/jhclp/vol10/iss1/3.  In this important paper we read great summaries of case law showing that tallying up actual numbers of injured people is essential to legal rulings on the (un)constitutionality of public health actions:

> Epidemiology, however, also plays an important role in constitutional law, especially in many doctrines and cases, some of which were discussed above, in which the state's purported attempt to protect public health is relevant to the determination of the constitutionality of state action. Indeed, in such cases epidemiology and its sister sciences, such as biostatistics, are absolutely critical to understanding both what courts are doing and the constitutionality of particular state actions…. Consider, for example, the Court's analysis of Massachusetts's attempt to regulate cigar and smokeless tobacco advertising in *Lorillard Tobacco Co. v. Reilly*. [533 U.S. 525 (2001)]. Under the prevailing First Amendment commercial speech doctrine, the constitutionality of the state's regulations depended upon the state being able to show, first, that it was advancing a substantial state interest, second, that the regulations directly advanced such an interest, and third, that the regulations were no more extensive or burdensome than was necessary. As previously discussed, the Court has consistently accepted that public health is a valid and even important state function. But how could the Court know that the regulation of tobacco marketing to minors was in fact related to protecting public health? Moreover, how could the Court know whether the regulations protected public health, either directly or at all, and in a manner no more extensive than is necessary to achieve the state goal? ***To answer each of these questions, the Court had to review and assess epidemiological evidence***.

Wendy E. Parmet, *Public Health and Constitutional Law: Recognizing the Relationship*, 10 J. HEALTH CARE L. & POL'Y at 20 [emphasis added].

No governmental agency has ever provided epidemiological evidence to support vaccine safety claims. The only evidence relevant to answering this particular question is a ***numerical***

12

_accounting_ of the health outcomes between exposed and unexposed. Nothing short of this can answer the question: Are vaccines producing more good than harm to public health? A million experts claiming safety without numbers cannot stand before one expert with numbers. History has shown us, for example, the abused power of deference to authority via bloodletting as the misguided standard of care, tobacco science falsely claiming to be good for health, Vioxx science as bought and paid for by Pharma, and many recalled vaccines.  Deference to authority without numbers is unscientific. Control group science is scientific.

Consider the words of legal scholar Rachael N. Pine in _Speculation and Reality: The Role of Facts in Judicial Protection of Fundamental Rights_, 136 U. PA. L. REV. 655, 726–27 (1988) (arguing that adherence to precedent should not bind courts to follow prior cases upholding a statute when legislative facts previously essential to its constitutionality have changed or their falsehood has become demonstrable).

In not too distant U.S. history, the public was informed that smoking cigarettes was _good for health_, and there were an almost endless stream of licensed medical professionals offering up their "expert" opinions that smoking even _improved_ our health.  If this farce had not been ended with the most fundamental scientific process, i.e., an epidemiological study to measure health outcomes between exposed and unexposed for comparison, the tobacco industry might well still be paying off our lawmakers and scientists. They certainly had plenty of "expert" medical opinions on their side. In the end, it was the scientific method that saved us all. In particular, the method that saved us, is now the method most vehemently _rejected_ in vaccine 'safety science'.

The police power is not a rubber stamp. This is confirmed in the most recent of United States Supreme Court cases, as well as historic cases. For example, consider the recently decided United States Supreme Court case _Roman Catholic Diocese v. Cuomo_, No. 20A87, 592 U.S. ___, 141 S. Ct. 63, 208 L. Ed. 2d 206, 211 (Nov. 25, 2020) (granting injunction against Governor Cuomo's public health restrictions on religious services because the restrictions were not actually serving public health in a manner consistent with the Constitution; and especially Justice Gorsuch concurring, "Why have some mistaken this Court's modest decision in _Jacobson_ for a towering authority that overshadows the Constitution during a pandemic? In the end, I can only surmise that

much of the answer lies in a particular judicial impulse to stay out of the way in times of crisis. But if that impulse may be understandable or even admirable in other circumstances, we may not shelter in place when the Constitution is under attack. Things never go well when we do.") *Id.* at 214.[8]

### f.   Informed Consent / Informed Refusal.

A sizeable portion of Petitioners' Petition is related to the law and ethic of Informed Consent / Informed Refusal.  These principles are so well established in caselaw, textbooks (both legal and medical), and in scholarship that they do not require (nor could they be given) a full exposition in this brief.  Petitioners will simply provide a few supporting references for emphasis.[9] *See also* PRJN2 Re Informed Consent.

### 2.   Petitioners Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Injunction.

"[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm." *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008).[10]  As

---

[8]    *See also Jew Ho v. Williamson*, 103 F. 10 (C.C. N.D. Cal. 1900), where the court properly invalidated the quarantine of a San Francisco district that was inhabited primarily by Chinese immigrants; the measure purportedly to control the spread of bubonic plague was found to increase the risk of spreading the disease.  This case emphasizes that public health authorities sometimes do things that harm public health, and it is the job of the court to remedy the constitutional violation in the name of individual and public health.

[9]    In *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003) (reversing pretrial dismissal of parents' constitutional challenge to the school's practice of requiring blood tests and physical examinations without parental consent), the 10th Circuit cited the United States Supreme Court to protect parental rights in medical decision making, "…the right to refuse a medical exam and the parent's right to control the upbringing, including the medical care, of a child - fall within this sphere of protected liberty. *See Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 278, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990) (the "principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions"); *Troxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 2060, 147 L. Ed. 2d 49 (2000) ("the interest of parents in the care, custody, and control of their children - is perhaps the oldest of the fundamental liberty interests recognized by this Court")." Likewise, another quote from *Cruzan, supra,* 497 U.S. at 279 is, "It cannot be disputed that the Due Process Clause protects an interest in life as well as an interest in refusing life-sustaining medical treatment."  See also *Anderson v. City of Taylor*, 2005 U.S. Dist. Lexis 44706 (E.D. Mich. August 11, 2005) (mandatory blood draws for a fireman's "wellness program" under FEMA auspices was invalidated as a Fourth Amendment seizure because the blood draws were mandatory and the firemen were subject to punishment for not agreeing).

[10]    Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages. See *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Because intangible injuries generally lack an adequate legal remedy, "intangible injuries [may] qualify as irreparable harm." *Id. Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Moreover, to support injunctive relief,

14

1   highlighted above, Petitioners devote multiple paragraphs of the Verified Petition to the irreparable

2   harm and imminence of their injuries.  The Verified Petition specifies each Petitioner's injuries with

3   particularity (e.g., even including details of specific denial of education solely on the basis of

4   vaccination status, and a specific instance of a child protective services visit solely on the basis of

5   vaccination status). Moreover, PRJN2 shows the persistent and pervasive hunting down of the

6   unvaccinated across the United States, in excruciating detail.[11]  During segregation in the 1950s,

7   Southern Democrat governors forcing "separate but equal" policies upon the people were not able

8   to avoid mandamus on the grounds that the discrimination problem was so pervasive and

9   widespread that the governors could not possibly be tasked with understanding what to do about it.

10  There exists no adequate legal remedy if the control group population is undermined to threatened

11  extinction, because proper science cannot be performed in the future if the legal right of informed

12  refusal is withheld in the present. It is this Court's job to protect such legal right.

13          Threats of warp speed mandatory vaccination for Covid-19 are already present throughout

14  the United States.  State and local governments are hastily drafting vaccine plans. Employers are

15  hastily drafting vaccine policies.  Millions of Americans such as Petitioners are making their own

16  quick plans, praying that the Article III Judiciary will uphold their Constitutional rights. This case

17  has been the benefactor of many such prayers.

18          Our Judiciary is called to weigh in on this imminent threat to the control group.  If unabated

19  by court order, irreparable harm to control group numbers will occur. The unvaccinated will rapidly

20  _____

21  harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in
    the indefinite future is not enough. Rather, "a plaintiff must demonstrate immediate threatened

22  injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co., Inc. v.
    Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

23  [11]     The Verified Petition emphasizes that the Petitioners are under constant threat of mandatory

24  vaccination, which is a form of coercion.  It is duress.  It is an unconstitutional condition. It is well
    established that the government may not coerce with its left hand the very thing its right hand is

25  disallowed.  *See, e.g.*, *Frost & Frost Trucking Co. v. R.R. Com. of Cal.*, 271 U.S. 583, 593-94
    (1926) (striking down state action conditioning use of state highways by a private trucker upon the

26  trucker's assumption of the status and burdens of a common carrier), finding "[T]he power of the
    state in that respect is not unlimited; and one of the limitations is that it may not impose conditions

27  which require the relinquishment of constitutional rights. If the state may compel the surrender of
    one constitutional right as a condition of its favor, it may, in like manner, compel a surrender of all.

28  It is inconceivable that guaranties embedded in the Constitution of the United States may thus be
    manipulated out of existence."

1   dwindle and the requested study and survey cannot take place. Even if there are hodge-podge,

2   mandatory Covid-19 vaccine roll outs, entire regions of the United States may be unavailable for

3   scientific inquiry if self-proclaimed do-gooders are allowed to do whatever they wish to

4   unvaccinated families. In the words of Christian author C.S. Lewis, "Of all tyrannies, a tyranny

5   sincerely exercised for the good of its victim may be the most oppressive. It may be better to live

6   under robber barons than under omnipotent moral busybodies." Lewis, C.S., *God In The Dock*

7   (1948).

8        As stated more fully in the Verified Petition, control group science is the last hope for the

9   preservation of our Nation, to illustrate that vaccines are the cause of the National Health Pandemic.

10  This <1% of the population must remain free from discrimination and coercion in the areas of

11  livelihood, travel, education as well as all other areas of their lives.  Petitioners' extensive scientific

12  body of evidence is sufficient probative evidence of the threatened, imminent injury. Petitioners'

13  declarations also demonstrate, in detail, the irreparable harm. Forcing vaccines on pure

14  unvaccinated children is like burning every heirloom seed and praying that corporate labs got it

15  right.

16             **3.   The Balance of Equities Weighs in Petitioners' Favor.**

17        To qualify for injunctive relief, Petitioners must establish that "the balance of equities tips in

18  [their] favor." *Winter*, *supra,* 555 U.S. at 20. In assessing whether the Petitioners have met this

19  burden, the district court has a "duty . . . to balance the interests of all parties and weigh the damage

20  to each." *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir.

21  1980).

22        As discussed more fully in the Verified Petition, preservation of the status quo during

23  pendency of the litigation is absolutely necessary as current and escalating mandatory vaccination

24  threatens the control group. Shunning the unvaccinated is currently at a fever pitch. Destruction of

25  the control group has never been more threatened.

26        Petitioners present substantial evidence that the unvaccinated are neither harming others nor

27  shedding diseases (i.e., the unvaccinated do not transmit infections at a higher rate than the

28  vaccinated do, but rather the rate is lower after taking into account transmitted infections that are

16

1   not targeted by the vaccine in question). For every single vaccine on the CDC schedule, the overall

2   risk of vaccination is exponentially greater than the zero to approximately zero overall risk of

3   remaining unvaccinated in America today. *See* especially Dr. Kimmel Declaration, paragraph 8.

4   Petitioners' evidence and experts confirm the unvaccinated have shown remarkable resilience to

5   infectious disease.

6          The evidence shows vaccination destroying our Nation. The unvaccinated hold the key to

7   health and recovery for our Nation.  So the balance of hardships weighs in Petitioners' favor.

8          "The entire preliminary injunction inquiry, and particularly the requirement that the district

9   court carefully balance the harms to the parties, is intended to ensure that the district court "chooses

10   the course of action that will minimize the costs of being mistaken." *American Hosp. Supply Corp.*

11   780 F.2d 589, 593 (7th Cir. 1986).[12]

12          If Petitioners' Pilot Survey is correct, and the mathematics prove it is, then our very Nation

13   hangs in the balance of whether we recognize and preserve control group evidence. Moreover,

14   granting a preliminary injunction is a win-win. Upholding informed consent/refusal is already a

15   tenet of law and ethics supported by President Trump. The harm the Respondent would suffer is

16   non-existent. Granting the injunction will benefit Respondent by way of being able to fulfill his

17   duty to preserve the Union and faithfully execute the law of the land.

18              **a.  The Balance of Equities Favors Non-Discrimination.**

19          Petitioners choose not to increase their own personal risk of chronic and deadly conditions

20   by thousands of percentage points by getting injected with vaccines. The risks of contracting

21   temporary infections, which may, or may not, result in any injury, are the lesser concern when

22   compared to an approximately 60% risk of developing chronic disease and an approximately 42%

23   risk of multiple chronic conditions as adults. This is what the Petitioners are aware they would be

24   _____

25   [12]       Even "serious questions going to the merits and a balance of hardships that tips sharply
     towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also
26   shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."
     *All. For The Wild Rockies v. Cottrell*, 632 F.3d at 1135. The public interest and the balance of the
27   equities factors merge when the government stands as a party. See *Drakes Bay Oyster Co. v. Jewell*,
     747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *Rosebud*
28   *Sioux Tribe v. Trump*, 2020 U.S. Dist. LEXIS 192328, *10, 2020 WL 6119319 (D. Mont. Oct. 16,
     2020).

facing if they were to join the 99.74% vaccinated population, or increase their levels of exposure. And there is no evidence to suggest that dramatically increasing the Petitioners' own risk of being afflicted with permanent and even disabling chronic illnesses can benefit "public health" in any way. Quite the contrary. People with multiple comorbidities are at a vastly increased risk of death from even the most benign of infectious agents, such as the common cold.

There's just no way to spin the "public health" argument to make it appear vaccines are "worth the risks" once the numbers have been examined. The fact that our agencies have refused to keep any pretense of an accurate accounting of these numbers, does not alter the fact they have now been counted. The government's refusal to keep an accurate accounting of vaccine risks, (nothing calculated to even 1% accurate) is not evidence of "safety". Bringing the public's risk of chronic illnesses up to 60% only makes 60% of the public far more vulnerable to complications and even death from infectious agents, even those agents that are generally considered innocuous in healthy people.

Approximately 94% of the deaths from Covid-19 have been in those with an average of 2.6 comorbidities. Ealy H., et al., *Covid-19 Data Collection, Comorbidity & Federal Law: A Historical Retrospective.* SCIENCE, PUBLIC HEALTH POLICY & THE LAW, Vol. 2: 4-12 (Oct. 12, 2020), https://www.publichealthpolicyjournal.com/ethics-in-science-and-technoldgy. There is clear evidence that continuing to increase the number of chronic illnesses in the population makes them more likely to die from infectious illnesses.

Petitioners' cause is just. They are entitled to protection against any form of discrimination which is due to their vaccination status. Their avoidance of vaccines is based upon a well-founded (upon actual evidence) distrust of the pharmaceutical industry and avoidance of its products. Every American who prefers to avoid a 60% risk of developing chronic illnesses is equally entitled to protection from discrimination for their choice to avoid such a risk.

**b. Health Agency Experts Pitch Slogans and Assumptions, Not Numbers. Petitioners Provide Statistically Confirmed Numbers; Petitioners Also Warn the Court in Advance of the Slogan Tactics of Health Agencies.**

Every single time that a health agency expert attempts to draw a conclusion that vaccines are "safe", "worth the risk", or similar, but the conclusion is not based on hard numbers, Petitioners

18

intend to move to strike the opinion as irrelevant at the very least, and potentially perjurious if the expert is aware he is lying in an attempt to defraud the Court.  Respondent has been warned.[13]

Only after Americans know the price to be paid, can Americans begin to evaluate what something might be worth. Health agencies have never once counted the price (in human lives) that is demanded in exchange for this "protection". It's just been a blank check this whole time. Truly, the only expert opinions relevant to defending against this lawsuit, would be those which are supported by evidence that the "expert" is specifically an expert on the numerical risks associated with vaccination, because Petitioners are not asking for relief based upon anything else. Petitioners are not asking for relief based upon slogans, guesses, presumptions, or anything other than hard facts based on unbiased math and science.

If the Respondent can present numerical evidence to refute these risk calculations, Respondent must present it, and to do so swiftly, because the trajectories evidencing the destruction of most of the population's health is imminent, demonstrating that we're almost out of time to salvage this Nation. The rate of children with chronic illnesses doubles every 12 years. The last numbers collected were from approximately 2017, and they showed no signs this trajectory has been altered.  *See, e.g.*, Dr. Hulstedt Decl.

Petitioners are requesting preservation of critical scientific evidence required to further confirm the validity of the numbers already gathered, and that Americans' rights to avoid discrimination as retribution for refusing to inject unavoidably unsafe drugs that are not at all "worth the risks", also be preserved and protected while further study is completed which can

---

[13]    Petitioners already understand many impressive-looking opinions have been published in support of the theory vaccines are "safe" and/or "worth the risks".  Petitioners also know that not one of these opinions is supported by any relevant evidence, i.e., an accounting of numbers which calculate the total risks associated with vaccination. The American Academy of Pediatrics, ACIP (Advisory Committee on Immunization Practices), and many others, and even the American Bar Association, (who now demands immediate passage of mandates for the Covid-19 vaccine to be injected into every man, woman, and child before it even hits the market) have made recommendations supporting and urging a continual flow of new laws mandating all CDC recommended vaccines, and others, for everyone. But opinions which are not supported by evidence (numbers relevant to risks) are irrelevant to the relief sought in this Court of Law.  And further, any opinions based upon the VAERS system with a 99% failure rate are equally irrelevant, and do nothing to refute Petitioners' evidence, the Control Group numbers.

1   support actions that will need to be taken in order to correct public health policies in a direction that

2   will protect this Nation from collapse.

3          **4.  The Requested Relief is Genuinely in the Public Interest.**

4         Courts in the Ninth Circuit apply a sliding scale approach to preliminary relief. *See All. for*

5   *the Wild Rockies v. Cottrell*, 632 F.3d at 1131. The reviewing court must balance the elements "so

6   that a stronger showing of one element may offset a weaker showing of another." *Id.* All parties

7   gain by upholding the medical ethic of informed consent/refusal. With experimental vaccines being

8   released at warp speed, the public has a right to decline forced vaccination while both the Court and

9   Respondent weigh in on the extensive evidence presented in this case. The imminent destruction of

10  the Country itself is at hand, as Americans are being damaged left and right as a result of scores of

11  vaccine-dose injections. The public has a right to know. Frankly, it is time to stop cowering to the

12  pharmaceutical industry or pretending that we don't see the obvious. If there was ever a time to

13  expose the controlling forces bent on the destruction of our Country, that time has arrived with the

14  attached new evidence.

15        **C.  Petitioners' Request in the Alternative for Order to Show Cause.**

16        This motion is also made in the alternative as a Request for Order to Show Cause, whereby

17  the Court shifts the legal burden to Respondent to prove numerically that benefits of vaccine

18  exposure, at any level of exposure, currently outweigh the short-term and long-term risks associated

19  with vaccine exposure.

20        In the beginning of Covid-19, PI motions and OSCs were denied right and left.  But new

21  case law from November and December 2020 shows that public health orders are no longer 'sacred

22  texts'. *See, e.g.*, *S. Bay United Pentecostal Church v. Newsom*, No. 20-55533, 981 F.3d 765-66 (9th

23  Cir. Dec. 8, 2020) ("In light of the Supreme Court's orders in *Harvest Rock Church, Inc. v. Newsom*,

24  No. 20A94, 592 U.S. ___, 2020 U.S. LEXIS 5709 (Dec. 3, 2020) and *Roman Catholic Diocese v.*

25  *Cuomo*, No. 20A87, 592 U.S. ___, 141 S. Ct. 63, 208 L. Ed. 2d 206 (Nov. 25, 2020), we **VACATE**

26  the district court's October 15, 2020 order denying the motion for injunctive relief filed by South

27  Bay United Pentecostal Church (South Bay), and **REMAND** to the district court for further

28  consideration of this matter." *Calvary Chapel Dayton Valley v. Sisolak*, No. 20-16169, 2020 U.S.

1     App. LEXIS 39266, at *2, 11 (9th Cir. Dec. 15, 2020) ("The district court denied the church's

2     request for a preliminary injunction barring enforcement of the Directive against houses of worship.

3     We reverse … the district court, instruct the district court to employ strict scrutiny review to its

4     analysis of the Directive, and preliminarily enjoin the State from imposing attendance limitations on

5     in-person services in houses of worship….").

6        Far-left Governor Newsom in particular has been the recipient of such judicial oversight.

7     *See, e.g.*, *Mark's Engine Company No. 28 Restaurant LLC v. County of Los Angeles, et al.,* Case

8     Number 20STCV45134 (Superior Court of California, County of Los Angeles) (Minute Order

9     December 8, 2020) (granting plaintiff's request for Order because "the County [defendant] has no

10     basis for the outdoor dining portion of the order and it must be enjoined until the risk-benefit

11     analysis is performed for outdoor dining."; *Midway Venture LLC v. County of San Diego*, Case

12     Number 37-2020-00038194-CU-CR-CTL (Superior Court of California, County of San Diego)

13     (Minute Order dated December 16, 2020) (granting plaintiffs' request for Order to Show Cause and

14     enjoining Governor Newsom from shutting down strip club businesses because they "do not present

15     any risk, much less a greater risk than before Governor Newsom issued his [stay at home order].

16     Since the County [defendant] could have produced 'stronger evidence', the Court discounts the

17     County's 'weaker evidence'."

18        It shocks the conscience that a strip club can remain open under our Constitution and yet

19     wholesome children (like Petitioner S.H., 11-years old, all-American athlete, honors student, loves

20     Jesus) is not allowed to congregate for Christian fellowship at Christian school because California

21     politicians simply decreed that it is "safe" to discriminate against natural children. If this continues

22     to be the outcome, then it will be said the American judiciary is complicit in allowing Pharma's

23     sacred cow of vaccines to eclipse this one nation under God.

24        Judges must weigh constitutional rights, and hold public health authorities accountable with

25     strict scrutiny. Moreover, Federal courts are supposed to actively intervene (even over lengthy

26     periods of time if needed) to safeguard constitutional rights.  *See, e.g.*, *Coleman v. Schwarzenegger*,

27     922 F. Supp. 2d 882, 1003 (E.D. Cal. 2009) (granting plaintiffs' request for ongoing Federal court

28     monitoring and active intervention to stop discrimination, because scientific risk assessment

1  supported Orders to Show Cause and follow-up orders to remedy prison population-wide

2  deterioration of health due to unmitigated constitutional violations).[14]

3      Public health law must always pose the questions: does a coercive intervention truly reduce

4  *aggregate health risks*, and what, if any, less intrusive interventions might reduce those risks as well

5  or better? There is zero evidence that the Petitioners, or others likewise situated, pose *any* risk to

6  public health by refusing to have their immune systems permanently altered in ways that

7  exponentially *increase* their risk of chronic, disabling, and even deadly illnesses *to 60%*, as opposed

8  to maintaining it at *less* than 6% by remaining *unexposed* to these experimental pharmaceuticals.

9  There is overwhelming evidence that 'public health' is now being *destroyed* by government-imposed

10  experimental medical interventions, i.e., mass vaccination programs. The government can show no

11  compelling interest, let alone a competing interest, to that of the Petitioners or other similarily-

12  situated Americans, who might also wish to *protect their health* from the harms that these

13  government interventions clearly impose.

14      In an attempt to explain a complete lack of *numerical* evidence with which to refute the

15  evidence presented by the Petitioners here, Respondent may argue that application of the most

16  fundamental and relevant scientific method has somehow been impossible to ever apply to this

17  problem. Such an argument would not represent evidence of anything. Petitioners here have

18  demonstrated that the scientific method *can* easily, and ethically, be applied to this particular

19  problem. Petitioners have applied this method, and supplied the numerical evidence. *Wanting to*

20  *know the answer* was the only prerequisite. Beyond this, there was no impediment to swiftly

21  locating and implementing the most obvious method that *would* result in the most reliable answers.

22

23

24  [14]     Burden shifting is also a recognized pre-trial function of trial courts. *See, e.g.*, *McDonnell*
*Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973) (after plaintiff makes a prima facie showing of
25  discrimination, the burden shifts to the defendant to show a lawful reason for defendant's conduct);
*United States v. Hand*, No. CV 15-96-H-CCL, 2017 U.S. Dist. LEXIS 6657, at *5 (D. Mont. Jan.
26  18, 2017) (granting summary judgment for plaintiff because after plaintiff presented a numerical
accounting with his pre-trial motion, the court held, "This evidence is sufficient to meet Plaintiff's
27  burden of proof and to shift the burden to Defendant to establish some genuine material fact that
must be tried. Defendant's response to the order to show cause fails to raise any genuine issue of
28  material fact requiring trial.").

1  *Not* wanting to know the answer is the only reasonable explanation for rejecting the scientific

2  method. Wearing a blindfold during the act *is not evidence of innocence*.

3  **IV. CONCLUSION**

4       The scientific method requires an unvaccinated control group remain intact. Law and ethics

5  require informed consent/refusal. The requested relief is necessary and appropriate to uphold good

6  science.

7       Dated: December 28, 2020

8

9           Respectfully submitted

10

11  Gregory J. Glaser (SBN 226706)        Ray L. Flores II (SBN 233643)
12  4399 Buckboard Drive, Box 423         11622 El Camino Real Suite 100
    Copperopolis, CA 95228                San Diego, CA 92130
13  Ph: (925) 642-6651                    Ph. (858) 367-0397
    Fx. (209) 729-4557                    Fx. (888) 336-4037
14  greg@gregglaser.com                   rayfloreslaw@gmail.com

15       **ATTORNEYS FOR PETITIONERS**

16

17

18

19

20

21

22

23

24

25

26

27

28